Bixby v. Bennett.

FRANCIS M. BIXBY AND OTHERS, *v.* WILLIAM T. BENNETT AND ANOTHER.

Where a consignor of a cargo improperly detains the vessel from going to sea, he is liable to the owner for his special damages.

The defendant shipped by the plaintiffs' vessel twenty-eight bales of cotton. By the Internal Revenue laws (Act of July 13th, 1866, § 5) it is declared to be unlawful for the master of a vessel to convey or transport cotton from any point in the district in which it shall have been produced, without a permit from the collector of the district, and a certificate that the tax has been paid. The defendant promised the master of the vessel to procure such a certificate and permit, but having neglected to do so, the master was unable to get a clearance, and was detained eleven days from going to sea.

*Held,* that the defendant was liable in damages, it being shown that the master had taken the best means known to him to notify the defendant of the cause of the delay.

*Held,* further, that in such a case, it was not the duty of the master either to pay the tax, in order to obtain a clearance of the vessel, or to unload and store the cotton.

Where there has been no agreement as to the rate of demurrage, the charterer or owner recovers an equivalent in damages for the whole time that the vessel is detained, through the delay or negligence of the freighter, the measure of damages being the loss or injury sustained thereby, which may be ascertained by showing what the vessel is capable of earning, or usually earns *per diem.*

This court can only reverse an order of the Marine Court denying a motion to open a default or trial, on the ground of irregularity.

A cause was ordered, in the Marine Court, to be tried on a certain day, and the defendant's attorney attended, and not finding the cause on the calendar, left the court. The plaintiff's attorney, however, had the cause placed on the calendar, and tried the cause, one of the defendants appearing in person and taking part in the trial. *Held,* that such a default or trial was not irregular.

APPEAL from an order denying a motion to open a judgment of the Marine Court, and from the judgment itself.

The action was brought by the owner of the ship A. B. Cook, for damages occasioned by the detention of the vessel under the following circumstances: Section 5 of the U. S.

Internal Revenue Act of July 13, 1866, provided, under a penalty, that it should be unlawful for a master of a vessel to convey cotton from the district in which it was produced without a permit for such removal, and a certificate that the tax had been paid, or a bond having been given for such payment to the collector at the place of delivery.

The defendant shipped, by the A. B. Cook, twenty-eight bales of cotton from Beaufort, S. C., to New York. The captain of the vessel, on the 25th day of February, began taking the cotton on board the A. B. Cook, at Beaufort, and told defendant Bennett he should go to sea from Hilton Head, on the 26th or 27th of February, and that he (Bennett) must have all his papers ready for him on the 26th. The papers alluded to were the papers indicating that the internal revenue tax on the cotton had been paid. Bennett agreed to have the "papers," so that the captain would not be detained, and could go to sea at the time fixed by the captain for sailing from Hilton Head. On the 27th of February, the captain was ready to sail from Hilton Head, but Bennett's "papers" did not come. The wind was fair, and he was all ready to go to sea on the 28th of February, but did not sail until the 12th of March following, because he had not the internal revenue receipts for the cotton; Mr. Bennett had not furnished them.

The captain applied for a clearance of his vessel every day at the custom-house, from the 27th of February until March 9th, but could not get it until the duties on the cotton had been paid. The receipts were then furnished on the morning of the 9th March.

Upon the conclusion of the trial, the justice gave judgment. A motion having been made to open the judgment, and denied, the defendants appealed from the judgment and order denying the motion to this court. The grounds of the motion sufficiently appear in the opinion of the court.

*Wakeman & Latting*, for appellants.

*A. Spaulding*, for respondent.

By the Court.—Daly, F. J.—We can only review the order denying the motion to vacate the trial upon the ground of irregularity. So far as the opening of the default rested in the discretion of the judge before whom the motion was made, it is not a matter which can be reviewed upon appeal.

There was no foundation for opening the default and vacating the trial upon the ground of irregularity. The order made by the court was, that the action be placed on the day calendar for trial on the 15th of October, 1868. The order was duly filed with the clerk, and it was for him to put the cause on the day calendar. This, it would seem, he omitted to do. The defendant's counsel attended with his witnesses, waited until all the causes on the calendar were called, and not seeing the plaintiff or his counsel, and finding the cause not on the calendar, left the court. This he did at his peril. He knew that, by the order of the court, the cause was to be placed on the calendar that day, and by calling the attention of the clerk to that fact, he could have had the cause put on the calendar and called, and if the plaintiff was not there, have had it dismissed. He had no right to presume that the order had not been filed with the clerk. It was in fact filed, and the defendant's counsel, without making any further inquiry, left the court about a quarter before eleven o'clock, A. M. This was the statement on the part of the defendants.

The counsel for the plaintiff states that he called the clerk's attention to the order made by the court; that it was found by the clerk; and that the cause was called upon the calendar about half past ten o'clock by Judge Gross, who ordered the cause to be tried before Judge Curtis, in an adjoining room. Two hours and a half elapsed before it was actually tried. After the defendant's counsel left, one of the defendants came into court, saw the plaintiffs' witnesses there, and remained until the cause was brought on for trial, when he asked for an adjournment, which the judge refused to grant; and the trial proceeded, the defendant conducting the defense in his own person.

The plaintiff was regular, and if the defendant desired the aid of his counsel, there was ample time for him to have

procured his attendance. The case may have been one for relief, if the counsel had left under the impression that the trial was not to be brought on; but that was wholly in the discretion of the judge to whom the application was made to open the default, and with the exercise of that discretion we cannot interfere.

There is no ground for reversing this judgment on the merits. The agent of the vessel testified that it was the duty of the shipper to furnish the papers from the collector of internal revenue; and the captain swore that he told the defendant, General Bennett, at Beaufort, that he should go to sea from Hilton Head, on Thursday afternoon or Friday morning; that he, Bennett, should have all his papers ready for him by Thursday morning; and Bennett said he would have the papers, so that the captain would not be detained, but could go to sea on Thursday or Friday. The agent of the vessel saw Bennett on Monday, the last day the vessel lay at Beaufort, and Bennett said to him: You need not be alarmed, the papers will be ready before the vessel is ready. These facts were not contradicted by Bennett, who was examined as a witness on his own behalf. It appears that he entered into a bond to pay the tax, under the new Internal Revenue Act, and as he understood the internal revenue agent to say that he was going to Hilton Head with the captain, or, at any rate, that he was to go there before the ship could receive the balance of the freight, in order to make the necessary clearance, he, Bennett, did nothing further about the matter, but returned to his plantation. It does not appear that the captain knew anything about the giving of the bond. Indeed, he testified that nothing at all was said about a bond; and denied, when the interrogatory was put to him, upon his cross-examination, that it was understood between himself, the internal revenue agent, and the defendant, that the papers were all correct.

On Thursday, the 26th, the vessel left Beaufort for Hilton Head; and upon the following day, Friday, the freight to be taken there was got in, and the vessel was ready for sea on the 28th, with a fair wind; but the captain could not get a clearance for the want of a receipt that the internal revenue tax

Bixby v. Bennett.

upon the defendants' cotton had been paid at Beaufort. This was entirely owing to the defendant's neglect. It was his duty as shipper to furnish the captain with the necessary papers to show that the internal revenue tax upon his cotton had been paid; and even if it had not been, he had expressly agreed to do so. The delay of the vessel arose from his assuming that the internal revenue officer would go to Hilton Head, to make the necessary clearance, according to his promise, and because it was customary; whereas that officer did not go to Hilton Head until nearly a week after the vessel had left Beaufort, and did not then bring the papers necessary for a clearance. It was, in fact, relying upon another to do, what he was bound and had engaged to do himself; and from the delay which arose from its not being done, neither the captain, nor the owners of the vessel, were in any way accountable.

No laches could be imputed to the captain. He was ready to sail on the 28th, and had a favorable wind. He waited two days for the papers, and then despatched a letter to the defendant by mail. He mailed the letter at Hilton Head, and receiving no reply, mailed another, four days afterwards, on the 6th; and on the morning of the 9th, a letter was received, enclosing the receipt. The wind was then ahead, and a further delay of three days ensued before the captain could put to sea.

It is urged that he should have despatched a special messenger to the defendant to advise him of the delay of the vessel and the cause of it, as the defendant testified that the letter directed to him, had been sent through the post-office, by Beaufort, a round-about course, and that it would have reached him about as soon if it had been sent to New York. But it does not appear that the captain knew this. He was asked by the defendant, " Are you not aware where my residence is on St. Helena Island?" and he answered " No." " Were you not aware at the time?" and the reply was " No." The agent of the vessel, who had been at the defendant's plantation, was asked if they could not have notified the defendant in a day, and his answer was " No." " I mentioned to Captain Small if

we only knew where it was." He was then asked if they did not know it was Swayne's store, a place seven miles distance by water, where the plantation was, and he answered, I presume they did. I think the captain did all that he was required to do. He notified the defendant by mail from the nearest post-office, and if that did not prove to be the quickest way to relieve him of the delay, it was no fault of the captain's. He resorted to the usual and proper course, and if it took six days for a letter to reach the defendant by mail, through defective postal arrangements or from any other cause, the captain or his principals are not to be held answerable. The delay in reality was occasioned by the defendant giving a bond, instead of paying the tax, as he was afterwards obliged to do when he learned of the delay of the vessel; for the bond, it appears, had to be, or it was, sent to the collector at Charleston for his approval, and it may be presumed was not returned to Beaufort by the 8th, as the defendant had then to pay the tax, that the vessel might be cleared.

It is argued that there is nothing in the evidence to show that the collector was justified by law in refusing to clear the vessel. The collector refused to give a clearance, because the tax upon twenty-eight bales of cotton on board of her had not been paid, or because the master had no official receipt, paper, or other evidence to show that it had been paid. The act of Congress of July 13, 1866, section 2, declares that the tax upon cotton, provided for in the previous section, shall be levied by the assessor upon the producer, owner, or holder thereof, and shall be paid to the collector of internal revenue, within and for the collection district in which said cotton shall have been produced, and *before the same shall have been removed therefrom* (Acts of the First Session of the 29th Congress, p. 14), and under this provision the custom-house officer at Hilton Head, whose duty it was to prevent frauds upon the revenue, was justified in detaining the vessel until he had some evidence that the tax was paid, or a bond given for it, as required by law. But whether he had or had not, negligence cannot be imputed to the master in detaining his vessel until he could get a clearance from the custom-house. It is as old as *Guidon* and

*Molloy,* that the master must obtain the necessary clearances or permission to sail from the officers of the customs, pay the necessary port and other charges for the purpose, and that he must not knowingly mix up and take with his cargo goods upon which a tax or duties are payable before they can be taken away from the port of departure (Guidon, c. 5, art. 33 ; Molloy, book 2, c. 2 & 9 ; Abbott on Shipping, 348, 8th Lond. ed.) The *fifth* section of the act already quoted, provides that it shall be unlawful for any master of a vessel to convey cotton from the district in which it has been produced, without a permit for such removal from the collector of the district, and a certificate that the tax has been paid, under a penalty of $100 *for each bale,* or a year's imprisonment. If the captain had sailed with the cotton, without this permit, he would have subjected himself to a pecuniary penalty of $2,800, or imprisonment. A clearance was, therefore, indispensable, and the custom-house officer at Hilton Head very properly refused to give it until the receipt for the payment or the bonding of the tax was furnished.

It would be preposterous to hold, as the defendant's counsel insists, in his argument, that to prevent the delay, the captain should have taken out the twenty-eight bales from his vessel, and stored them at Hilton Head, or, in other words, that after all his cargo was taken in, and he was ready for sea, he should have broken bulk, and put the owners to the expense and trouble of the taking out of twenty-eight bales of cotton, which, for all that we know, may have been at the bottom of the ship, to save the defendant from the expense of a demurrage occasioned by his own fault or to lessen the amount of it.

Neither was he called upon to send to Beaufort and pay the tax. Both he and the agent might very well assume, from the defendant's assurance, that the papers would be sent to Hilton Head before the vessel would be ready to sail, that the tax had been paid, and that through somebody's neglect, the receipt had not been sent. He did exactly what he ought to have done. He notified the defendant by letter that he could not clear his vessel for want of the permit, which the defendant had promised to have ready; that he was thereby detained

from going to sea, and that he would hold him responsible for the detention, and this was all that could be reasonably expected on the part of the captain. There might be circumstances in which it would be the duty of a master having cotton on board his ship, to pay the tax and charge it upon the cotton, where the owner could not be found or could not be reached without involving a very long delay of the vessel; but this was not such a case. Justice Selden, in *Hamilton* v. *McPherson,* (28 N. Y. Rep. 76,) says, that "the law imposes upon a party subjected to injury by the breach of a contract, the active duty of making reasonable exertions to render the injury as light as possible; that public interest and sound morality accord with the law in demanding this, and if the injured party, through negligence and wilfullness, allows the damages to be unnecessarily enhanced, the increased loss falls justly upon him." The captain, in my judgment, did make reasonable exertions, and neither he nor the agent are chargeable with either negligently or wilfully allowing the damages to be enhanced unnecessarily.

The plaintiff recovered for a detention of ten days. The vessel was ready to sail on the 28th of February, 1867, which that year was the last day in February. The permit was received on the morning of the 9th of March, but the wind was then north-east, which, being a head-wind, the vessel could not and did not get to sea until the morning of the 12th of March, that is from the date of the protest, ten days, or less than the plaintiff was entitled to, the vessel having been actually detained eleven days, after she was ready to sail, without any fault on the part of the captain or owners. The plaintiff makes the computation five days and a half, by commencing with the day after the date of the protest, and ending on the morning of the 9th, when the permit was received; but I am at loss to see what ground he has for such a computation. Where there has been no agreement as to the rate of demurrage, the charterer or owner receives an equivalent in damages for the whole time that the vessel was detained, through the delay or negligence of the freighter, the measure being the loss or injury sustained thereby, which may be ascertained by showing

what the vessel is capable of earning, or usually earns, *per diem*, as was done in this case. (*The Angerona*, 1 Dods. Adm. R. 382; *Moorsom* v. *Bell*, 2 Camp. 616; *Kell* v. *Anderson*, 10 Mee. & Welsb. 498; *Horn* v. *Bannsan*, 9 Car. & P. 709; *Clandaniel* v. *Tuckeman*, 17 Barb. 190; *Morse* v. *Pesant*, 2 Keyes' R. 16; Abbott on Shipping, 306, 307, 8th Lond. ed.)

The judgment should be affirmed.